DAVID D. WHIPPLE (Utah State Bar No. 17347)
*PRO HAC VICE* APPLICATION PENDING
WhippleDa@sec.gov
AMY J. OLIVER (Utah State Bar No. 8785)
*PRO HAC VICE* APPLICATION PENDING
OliverA@sec.gov
Counsel for Plaintiff
U.S. Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, UT 84101-1950
Tel.: (801) 524-5796
Fax: (801) 524-3558

Local Counsel:
AMY JANE LONGO (Cal. Bar No. 198304)
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Email: LongoA@sec.gov
Phone: (323) 965-3835
Fax: (213)-443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>           **Plaintiff,**<br><br>     vs.<br><br>**GREGORY LAMONT DRAKE, an individual; STEPHEN KENNETH GROSSMAN, an individual; STEPHEN SCOTT MOLESKI, an individual; JASON DAVID ST. AMOUR, an individual; and DAVID ALAN WOLFSON, an individual,**<br><br>           **Defendants.** | Case No.<br><br>**COMPLAINT** |

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges as follows:

## JURISDICTION AND VENUE

1. The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. § 77t(b) and (g)] and Sections 21(d) and (e) of the Exchange Act [15 U.S.C. § 78u(d) and (e)] to enjoin such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as this Court may deem just and appropriate.

2. Defendants were involved in the offer and sale of the common stock of numerous microcap companies, which are each a "security" as that term is defined under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

3. Defendants, directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce in connection with the conduct alleged in this Complaint.

4. This Court has subject matter jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa], and 28 U.S.C. § 1331.

5. Venue in this District is proper because Defendants are found, inhabit, and/or transacted business in the Central District of California and because one or more acts or transactions constituting the violations occurred in the Central District of California.

## SUMMARY OF THE ACTION

6. Gregory Lamont Drake ("Drake"), Stephen Kenneth Grossman ("Grossman"), Stephen Scott Moleski ("Moleski"), Jason David St. Amour ("St. Amour"), and David Alan Wolfson ("Wolfson") (collectively "Defendants") operated call centers and/or worked in call centers that were engaged in soliciting

investors to purchase the securities of numerous microcap companies whose shares traded on the over-the-counter market.

7. Without telling investors, Defendants Drake, St. Amour, and Wolfson coordinated the trades between the sellers of the shares and solicited investors to enable the sellers to offload their shares without significantly affecting the market for the thinly-traded stock.

8. While they engaged in these solicitations, Defendants were neither registered with the Commission as brokers or dealers nor associated with a broker or dealer registered with the Commission.

9. Defendants earned transaction-based compensation for their solicitation activities, which ranged from approximately 18% to 50% of investment proceeds.

10. By engaging in this conduct, as further described herein, Defendants violated and, unless restrained and enjoined by this Court, may continue to violate Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)(1)].

11. Additionally, by engaging in this conduct, as further described herein, Defendants Drake, St. Amour, and Wolfson violated and, unless restrained and enjoined by this Court, may continue to violate Section 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1) and (3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b–5(a) and (c) [17 C.F.R. § 240.10b–5(a) and (c)].

## DEFENDANTS

12. **Gregory Lamont Drake**, born in 1976, is last known to reside in Inglewood, California and operated a securities solicitation call center in Los Angeles County, California until approximately February 2018.

13. **Stephen Kenneth Grossman**, born 1949, is last known to reside in Woodland Hills, California. Grossman worked as a solicitor in one of Wolfson's

call centers and eventually became the manager of Wolfson's Thousand Oaks call center.

14. **Stephen Scott Moleski**, born 1959, is last known to reside in Woodland Hills, California. Moleski worked as a solicitor in one of Wolfson's call centers and eventually became the manager of Wolfson's Garden Grove call center.

15. **Jason David St. Amour**, born 1969, is last known to reside in Beaconsfield, Canada, but also maintains a residence in Redondo Beach, California. St. Amour has been involved in various investor-solicitation operations, including Drake's and Wolfson's operations, in addition to briefly running his own operation out of Montreal, Canada.

16. **David Alan Wolfson**, born 1956, is last known to reside in Los Angeles, California. Wolfson operated four securities solicitation call centers in California until approximately March 2018.

## FACTS

**Wolfson**

17. From at least October 2014 until March 2018, Defendant Wolfson operated four call centers in California for the purpose of soliciting investors to purchase various securities: two in Tarzana, California, one in Garden Grove, California, and one in Thousand Oaks, California.

18. Wolfson hired various individuals to work as solicitors in these call centers as part of the securities solicitation business.

**Grossman**

19. In or around March 2016, Wolfson hired defendant Grossman to work as an investor solicitor in one of his Tarzana, California call centers.

20. As an investor solicitor, Grossman cold called prospective investors, pitched them on an investment in the promoted security, and assisted investors in purchasing the promoted security.

3

21. In or around the spring of 2017, Wolfson promoted Grossman to work as the manager of his Thousand Oaks call center.

22. As manager, Grossman both oversaw the work of several individual solicitors and continued to directly solicit investors.

23. Wolfson paid Grossman commissions of at least 18% on his own sales and an additional 5% commission on the sales of those he supervised.

**Moleski**

24. In or around the spring of 2015, Wolfson hired defendant Moleski to work as a solicitor in one of his call centers.

25. As an investor solicitor, Moleski cold called prospective investors, pitched them on an investment in the promoted security, and assisted investors in purchasing the promoted security.

26. Sometime in 2017, Wolfson promoted Moleski to work as the manager of his Garden Grove call center.

27. As manager, Moleski both over saw the work of several other individual solicitors and continued to directly solicit investors.

28. Wolfson paid Moleski commissions of at least 20% on his own sales and an additional 5% commission on the sales of those he supervised.

**Drake**

29. Sometime in or around early 2016, Wolfson hired defendant Drake to work as a solicitor in Wolfson's Garden Grove call center.

30. As an investor solicitor, Drake cold called prospective investors, pitched them on an investment in the promoted security, and assisted investors in purchasing the promoted security.

31. Wolfson paid Drake a commission of at least 15% of investor proceeds.

32. After working for the Wolfson operation for several months, Drake left in or around the late summer of 2016 over a disagreement over his

4

compensation.

33. Drake then set up his own securities-solicitation call center in California that operated until approximately February 2018.

**St. Amour**

34. During 2015, Defendant St. Amour was working for an investor-solicitation call center in the Philippines run by a British citizen, M.M.

35. St. Amour became dissatisfied with working for M.M. and began searching for other opportunities.

36. Through his search, he came across a Craigslist advertisement that Wolfson posted recruiting securities solicitors.

37. St. Amour contacted Wolfson, and although St. Amour never actually worked in one of Wolfson's call centers, he introduced Wolfson to M.M.

38. Through this connection, Wolfson and M.M. began a partnership pursuant to which Wolfson would provide M.M. with stocks to promote, and M.M. would give Wolfson a portion of the commissions earned through M.M.'s operation.

39. For connecting Wolfson and M.M., St. Amour received a 9% commission on all deals the two worked together. Eventually, that commission was cut to 1%.

40. For a brief period in or around the summer of 2016, St. Amour operated his own securities solicitation call center in Montreal, Canada.

41. After shutting down his Montreal operation, St. Amour worked as a solicitor in Drake's Los Angeles County call center, where he worked until late 2017.

**The Matched-Trading Scheme**

42. While involved in the securities solicitation business, Drake, Grossman, Moleski, St. Amour, and Wolfson participated in a matched-trading scheme that generally operated as follows:

5

a. The call-center operators (*i.e.*, Wolfson, St. Amour, and Drake), would enter into arrangements with certain individuals, hereinafter referred to as the "selling shareholders," who would obtain large blocks of at least nominally unrestricted shares of microcap issuers.

b. The selling shareholders sought to profit quickly by selling their shares into the market, but understood that selling large amounts of thinly-traded microcap stock through standard brokerage sell orders would take a long time (if using limit orders) and/or cause a collapse in the share price (if using market orders).

c. To avoid these results, a selling shareholder would hire the call-center operators to engage their call centers in soliciting investors to purchase the selling shareholders' shares.

d. At the call-center operators' direction, the solicitors (such as Grossman and Moleski) used scripts and purchased lead lists to cold call prospective investors throughout the United States and inquired whether the prospect had an active brokerage account with online order-entry functionality.

e. If the prospective investor had such a brokerage account, the solicitors were instructed to pitch the promoted security—i.e., the one the selling shareholder owned and wished to liquidate—to the prospect.

f. Once a prospective investor was persuaded to purchase the promoted security and determined how much money he or she would like to invest, the solicitor would tell the investor that a "market maker" needed to be contacted to determine the appropriate share price.

g. Instead of contacting a market maker, the solicitor (e.g., Grossman and Moleski) would pass this information on to the call-center operator (e.g., Drake, St. Amour, and Wolfson), who would contact the selling shareholder.

h. The selling shareholder would then check the then-current level II quotation (which shows the offers on the ask and bid) for the subject security and provide the call center-operator with a limit order price and volume.

i. The call-center operator would communicate that price and volume to the solicitor, who would pass the information along to the investor.

j. The solicitor would instruct the investor to enter a purchase limit order online in the investor's brokerage account at the coordinated price. At the same time, the selling shareholder would place a sell limit order for the same amount of shares at the same price.

k. Through these means, the investor's buy order and the selling shareholder's sell order were likely to match, thus enabling the selling shareholder to liquidate his or her position in the subject security piecemeal into a market with ready purchasers.

l. The source of the purchased shares (i.e., the selling shareholders) was not disclosed to investors, who were instead led to believe that they were participating in standard open market transactions.

m. The call-center operators and the selling shareholder would discuss how many shares of the investor's order were "captured" (i.e., matched between the investor and the selling shareholder), and the selling shareholder would pay the call-

center operators a commission that was generally between 25% and 50% of the invested funds.

n. The call-center operators then paid a portion of these commissions to the solicitor who was responsible for the trade.

43. During the timeframe that Wolfson ran his call centers, his operation solicited investors to purchase the shares of at least 41 microcap companies with the following ticker symbols: ADAD, AGYP, ASNT, BBGP, BMXI, CSSI, CGLD, DAVC, ECEZ, ETKR, GMER, GMNI, GOPH, GVCL, GYST, HVST, ITEC, ITLL, KAST, KPOC, LBTD, LSDC/SIRC, MCPI, MIHI, MJLB, MMEG, NSRS, NWGI, PCFP, PYTG, REAC, SCNA, SHRV, SIGO, SMPI, SOAN, SSWH, TPTW, TRBO, UATG, and WRIT.

44. For his work as a call-center operator, Wolfson received gross commissions from the selling shareholders of at least $10,008,133.49 between October 2014 and February 2018, a portion of which he used to pay the solicitors working in his call centers.

45. Wolfson paid Grossman gross commissions of at least $259,585.68 between March 2016 and January 2018 for Grossman's work as a solicitor/manager.

46. Wolfson paid Moleski gross commissions of at least $260,679.15 between May 2015 and March 2018 for Moleski's work as a solicitor/manager.

47. During the timeframe that Drake ran his call center, his operation solicited investors to purchase the shares of at least six microcap companies with the following ticker symbols: GMNI, KPOC, SIRC, SMAA, TPTW, and UATG.

48. Collectively, Wolfson and the selling shareholders paid Drake gross commissions of at least $748,654.43 between May 2016 and February 2018, a portion of which Drake used to pay the solicitors working in his call center.

49. Between July 2016 and November 2017, St. Amour earned gross commissions of at least $72,021.00 for his involvement in the Wolfson operation,

the Drake operation, and through St. Amour's Montreal, Canada investor solicitation operation.

## FIRST CLAIM FOR RELIEF

**Violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)]**

(*Against each Defendant*)

50. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–49, inclusive, as if they were fully set forth herein.

51. By engaging in the conduct described above, Defendants:

   a. engaged in the business of effecting transactions in securities for the account of others; and

   b. directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities without being registered as a broker or dealer with the Commission or associated with a broker or dealer registered with the Commission.

52. By reason of the foregoing, Defendants violated and, unless enjoined, will continue to violate Sections 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## SECOND CLAIM FOR RELIEF

**Violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)]**

(*Against Defendants Drake, St. Amour, and Wolfson*)

53. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–49, inclusive, as if they were fully set forth herein.

54. By engaging in the conduct described above, Defendants Drake, St. Amour, and Wolfson, directly or indirectly, individually or in concert with others,

9

in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails have

  a. employed devices, schemes, or artifices to defraud; and

  b. engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit.

55. With respect to violations of Sections 17(a)(3) of the Securities Act, each of Defendants Drake, St. Amour, and Wolfson was at least negligent in their conduct.

56. With respect to violations of Section 17(a)(1) of the Securities Act, each of Defendants Drake, St. Amour, and Wolfson engaged in the above-referenced conduct knowingly or with sever recklessness.

57. By reason of the foregoing, Defendants Drake, St. Amour, and Wolfson violated and, unless enjoined, will continue to violate Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

## THIRD CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b–5(a) and (c) [17 C.F.R. § 240.10b–5(a) and (c)]**

(*Against Defendants Drake, St. Amour, and Wolfson*)

58. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–49, inclusive, as if they were fully set forth herein.

59. By engaging in the conduct described above, Defendants Drake, St. Amour, and Wolfson, directly or indirectly, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails have

  a. employed devices, schemes, and artifices to defraud; and

  b. engaged in acts, practices, and course of business which

operated as a fraud and deceit upon purchasers, prospective purchasers, and other persons.

60. Each of Defendants Drake, St. Amour, and Wolfson engaged in the above-referenced conduct knowingly or with severe recklessness.

61. By reason of the foregoing, Defendants Drake, St. Amour, and Wolfson violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b–5(a) and (c) [17 C.F.R. § 240.10b–5(a) and (c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendants from, directly or indirectly, engaging in conduct in violation of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)];

### II.

Permanently restraining and enjoining Defendants Drake, St. Amour, and Wolfson from, directly or indirectly, engaging in conduct in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b–5 [17 C.F.R. § 240.10b–5];

### III.

Permanently restraining and enjoining Defendants from directly or indirectly, including, but not limited to, through any entity owned or controlled any of them, soliciting any person or entity to purchase or sell any security;

### IV.

Ordering Defendants to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

**V.**

Ordering Defendants to pay a civil penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and, as to Drake, St. Amour, and Wolfson, also Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)];

**VI.**

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and,

**VII.**

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

Dated: January 15, 2020

/s/ Amy Jane Longo
Amy Jane Longo
Attorney for Plaintiff
Securities and Exchange Commission